UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
JACQUELINE RIZK and SAMIR GONSALVES,

                        Plaintiffs,


        -against-                                    **MEMORANDUM AND ORDER**
                                                     14-CV-6434 (RRM) (RER)
CITY OF NEW YORK, NEW YORK CITY POLICE
DEPARTMENT, POLICE OFFICER FIRADAUS
MEHIRDEL (Tax Reg. # 950309), POLICE OFFICER
DANNY LEE (Tax Reg. # 950736); SERGEANT
JOEL ROSENTHAL (Tax Reg. # 946197), LIEUTENANT
GEORGE HOWLEY (Tax Reg. # 904177), and
POLICE OFFICER JOHN DOES 1–10,

                        Defendants.
-----------------------------------------------------------------------x
ROSLYNN R. MAUSKOPF, Chief United States District Judge:

        Plaintiffs Jacqueline Rizk and Samir Gonsalves bring this civil rights action against the

City of New York (the "City"), the New York City Police Department (the "NYPD"), and

several NYPD employees – Lieutenant George Howley, Sergeant Joel Rosenthal, and Police

Officers Firadaus Mehirdel, Danny Lee, and John Does 1–10 (collectively, the "Individual

Defendants"), principally alleging that their constitutional rights were violated on August 3,

2013, incident in which they were detained and/or arrested.  Defendants now move for summary

judgment with respect all four federal and all six state-law causes of action.  For the reasons set

forth below, defendants' motion is granted in part and denied in part.

## BACKGROUND

        Unless otherwise indicated, the following facts are undisputed.  In the early morning

hours of Saturday, August 3, 2013, plaintiffs were at Static, a bar/lounge located on Steinway

Street in Astoria, Queens.  At the time, plaintiff Rizk was employed as an Assistant District

Attorney in the Queens County District Attorney's Office, where she had worked for roughly seven years.  (Plaintiffs' Statement of Disputed Facts pursuant to Local Civil Rule 56.1 ("Pl. 56.1") (Doc. No. 86) ¶ 2; Defendants' Statement pursuant to Local Civil Rule 56.1 ("Def. 56.1") (Doc. No. 82) ¶ 2.)  Plaintiff Gonsalves had been employed by the NYPD for ten years and was a detective assigned to Transit District 20.  (Pl. 56.1 ¶ 3; Def. 56.1 ¶ 3.)

At approximately 4:30 a.m., after "hanging out" at the bar for several hours, plaintiffs left Static with a mutual friend of theirs.  (Pl. 56.1 ¶ 1; Def. 56.1 ¶ 1.)  The three walked to Gonsalves' parked car, then had a disagreement about what to do next.  (Pl. 56.1 ¶ 6; Def. 56.1 ¶ 6.)  Rizk wanted to go home, while Gonsalves wanted to go out for breakfast.  (*Id.*)  There was some physical contact between plaintiffs in the course of this disagreement, (Pl. 56.1 ¶¶ 12–13; Def. 56.1 ¶¶ 12–13), although both plaintiffs deny that they were "fighting."  (Pl. 56.1 ¶¶ 15, 17.)

At about this time, Officer Lee was driving a marked patrol car southbound on Steinway Street with his partner, Officer Mehirdel, in the passenger seat.  (Deposition of Danny Lee ("Lee Dep.") (Doc. No. 84-5) at 11; Deposition of Firadaus Mehirdel ("Mehirdel Dep.") (Doc. No. 84-4) at 11.)  Near the intersection of 30th Avenue, they were stopped by a man driving a black SUV northbound on Steinway Street.  (Lee Dep. at 41–42; Mehirdel Dep. at 11.)  Through the open window of his vehicle, the man reported seeing a couple fighting farther south on Steinway Street.  (Lee Dep. at 43, 47; Mehirdel Dep. at 11–12.)

As the officers continued driving south, they encountered pedestrians who corroborated the information they had received from the driver of the SUV.  According to Lee, pedestrians reported seeing a man and woman fighting.  (Lee Dep. at 111, 113.)  Mehirdel did not hear what the pedestrians said but saw them pointing down the street.  (Mehirdel Dep. at 70–71.)

Seconds thereafter, the officers saw a couple standing in the street on the northbound side.  (Lee Dep. at 47; Mehirdel Dep. at 12–13.)  Mehirdel first saw them from a distance of 50 feet, as they were standing on the driver's side of a gray sedan, about 1 foot apart, and facing each other.  (Mehirdel Dep. at 34–36.)  The man – later identified as Gonsalves – was initially holding the woman – later identified as Rizk – by the hand, but she then "pulled away from him in a forceful way," as if "she didn't want to be touched."  (Mehirdel Dep. at 13.)  Lee recalled seeing the man "grabbing" the woman and heard them yelling at each other.  (Lee Dep. at 49–51, 55.)

Although Lee claimed that the yelling was very loud – 10 on a 10-point scale (Lee Dep. at 55) – Mehirdel did not even hear it until after Lee executed a U-turn, so as to position the patrol car behind the gray sedan.  (Mehirdel Dep. at 30.)  At their depositions, neither officer could recall what the couple was yelling about.  (Lee Dep. at 50; Mehirdel Dep. at 30, 32.)  However, Lee recalled that it abruptly stopped as the officers double-parked the police car parallel to and a little behind the gray sedan.  (Lee Dep. at 50, 55.)

The parties largely agree as to what happened immediately after the police arrived.  Mehirdel, who was still in the front passenger seat of the police car, spoke to Rizk through the open car window.  (Pl. 56.1 ¶ 25; Def. 56.1 ¶ 25.)  In sum and substance, he asked whether everything was okay and she replied that everything was fine.  (*Id.*)  Nonetheless, Mehirdel ordered Gonsalves to approach the officers, gesturing with his hand.  (Pl. 56.1 ¶ 26; Def. 56.1 ¶ 26.)  The parties disagree about whether Mehirdel used profanity in ordering Gonsalves to approach.  (*Id.*)

The parties agree that Gonsalves did not comply with this order, though they do not characterize happened next in the same way.  (Pl. 56.1 ¶ 27; Def. 56.1 ¶ 27.)  According to

3

Gonsalves, he initially took a step towards the patrol car in which Mehirdel was still seated and said, "Excuse me." (Gonsalves Dep. at 109.) However, when the officer then exited the car and, in an "irate" fashion told Gonsalves to "[g]et the fuck over here now," Gonsalves took a step back and "froze," as if in disbelief. (*Id.*) In contrast, Mehirdel testified that Gonsalves was yelling as he approached the patrol car, and that he stepped out of the car because he felt threatened by Gonsalves. (Mehirdel Dep. at 87, 143.)

The parties agree that Mehirdel then approached Gonsalves, closing to an arm's length from him, (Pl. 56.1 ¶ 28; Def. 56.1 ¶ 28), but they do not agree as to what happened next. According to Mehirdel, Gonsalves started "going off" on him, loudly yelling, "You don't even have a pin. You are a rookie." (Mehirdel Dep. at 74, 77.) As he spoke, Gonsalves "began … to point in [Mehirdel's] direction multiple times," moving his hand "forward and back and forward and back." (*Id.* at 74.) The last time he brought his hand forward, Gonsalves "shoved his two fingers in [Mehirdel's] chest," hard enough so Mehirdel felt it through his "very thick" vest. (*Id.* at 74–75, 190.) Mehirdel, who testified that he had already felt under threat from Gonsalves, decided to arrest – or at least handcuff – him after Gonsalves made contact with his chest. (*Id.* at 74, 143.)

Lee's deposition testimony corroborates Mehirdel's testimony that Gonsalves made contact with Mehirdel's chest. However, Lee testified that Gonsalves "kept touching" his partner before he "pushed him." (Lee Dep. at 67–68.) In addition, Lee could not recall what part of Gonsalves' hand touched Mehirdel's chest and admitted that he did not "have a clear view between Detective Gonsalves' hand and Officer Mehirdel's chest" because he was standing behind Gonsalves. (Lee Dep. 68, 113.)

In contrast, Gonsalves testified at his deposition that he never pushed Mehirdel or made any contact with his chest.  (Pl. 56.1 ¶ 32; Gonsalves Dep. at 165–66.)  He admitted telling Mehirdel that he was "unprofessional and disrespectful," and saying that he "must be a rookie" because he did not have "a pin" signifying five years of service.  (*Id.* at 162.)  It is unclear from Gonsalves' testimony precisely when he made this comment.

It is also unclear whether Mehirdel said anything after he resolved to handcuff Gonsalves.  Gonzales testified that the officers never said he was under arrest and "basically attacked" him.  (Gonsalves Dep. at 127.)  Lee claims that Mehirdel told Gonsalves to turn around, and that Lee – having worked with Mehirdel for over a year – perceived this order as implying that Mehirdel wanted to handcuff Gonsalves.  (Lee Dep. at 11, 75, 78.)  However, Mehirdel himself admitted that he was unsure what, if anything, he said before grabbing Gonsalves' right shoulder and turning him around to face the gray sedan.  (Mehirdel Dep. at 75, 140–41.)

The parties agree that after Mehirdel grabbed Gonsalves' right shoulder, Lee, who had been three feet behind Gonsalves, grabbed his left hand or wrist.  (Lee Dep. at 67, 77, 126; Gonsalves Dep. at 125–26.)  According to Gonsalves, Lee then twisted his left hand behind his back and pushed him against the gray sedan.  (Gonsalves Dep. at 125.)  Gonsalves assumed they were trying to handcuff him, though he claimed at his deposition that he did not know why.  (*Id.* at 126.)  Gonsalves claims that Lee was hurting his shoulder and wrist and that he told Lee, "I'm a detective.  You're going to break my hand."  (*Id.*)  When Lee did not relent, Gonsalves "pulled away" from Lee.  (*Id.* at 127.)  According to Lee, Gonsalves slipped free of Mehirdel's grasp – not his – then turned to face the officers.  (Lee Dep. at 81–82.)

The parties agree that Lee then forced Gonsalves to the ground.  (Lee Dep. at 82; Gonsalves Dep. at 127.)  Gonsalves recalled landing face forward on his knees, hands and

elbows, with Lee on top of him and Mehirdel on his right side.  (Gonsalves Dep. at 127, 129.)

Both Gonsalves and Lee recalled that Gonsalves then said he was a police officer or a detective.

(Lee Dep. at 84–85; Gonsalves Dep. at 129.)

Although the officers managed to place a handcuff on Gonsalves' right hand, they never

finished handcuffing him.  (Gonsalves Dep. at 127, 133.)  The officers were interrupted by Rizk,

who approached Mehirdel from behind while the men were still on the ground.  According to

Mehirdel, Rizk "attacked" him, cursing and demanding that he "get off" Gonsalves.  (Mehirdel

Dep. at 94, 147.)  Mehirdel recalled that she was initially on his back but was using her body and

arms to pull him off Gonsalves.  (*Id.* at 105, 147.)  He pushed her away, saying, "Move back,"

but she immediately returned and struck him on the back.  (*Id.*)  Rizk denies ever making contact

with Mehirdel.  (Deposition of Jacqueline Rizk ("Rizk Dep.") (Doc. No. 84-2) at 53–54.)

Mehirdel claims that her attack prompted him to stop what he was doing and call for an

additional unit.  (Mehirdel Dep. at 147.)  He then turned toward Rizk, grabbed her, and brought

her to the back of the gray sedan to handcuff her.  (*Id.*)  According to Mehirdel, she "resisted"

being handcuffed.  (*Id.*)  Gonsalves testified that he looked over in time to see Mehirdel

"basically manhandling her," or "roughing her up."  (Gonsalves Dep. at 129, 130, 132.)

While Mehirdel was in the process of handcuffing Rizk, Gonsalves showed Lee his

police identification which established that he was, in fact, a detective.  (Lee Dep. at 85;

Gonsalves Dep. at 132.)  According to Gonsalves, Lee then helped him off the ground, took off

the handcuff, and apologized, saying he was only "backing up" his partner.  (Gonsalves Dep. at

129.)  Gonsalves went over to Mehirdel and said, "Relax, she's an ADA."  (*Id.* at 132.)  Lee

pulled him away from Mehirdel but, by that time, other officers had arrived.  (*Id.*)

Mehirdel, believing he had succeeded in handcuffing Rizk, placed Rizk in the back of his patrol car. (Mehirdel Dep. at 123–24; Rizk Dep. at 61.) When he closed the door of the car, one of Rizk's legs was still sticking outside. (Rizk Dep. at 61.) At her deposition, Rizk implied that Mehirdel acted either deliberately or negligently, stating that he "closed the door on [her] leg that was visibly not all the way into the car yet." (*Id.*)

Sergeant Rosenthal arrived on the scene a few minutes after the officers radioed for assistance. (Deposition of Jack Rosenthal ("Rosenthal Dep.") (Doc. No. 84-6) at 48.) He immediately observed Rizk sitting in the back of the patrol car. (*Id.* at 49–50.) Shortly thereafter, he noticed that Rizk had managed to slip out of one of the handcuffs. (*Id.* at 50.) Mehirdel noticed this also and told Rizk to step out of the car so he could handcuff her again. (Mehirdel Dep. at 123.) According to Mehirdel, Rizk – who was talking/yelling and gesticulating – refused to exit voluntarily. (*Id.* at 123, 129, 131.) The parties agree that the officer then reached into the car and pulled her out, and that Rizk fell to the ground in the process. (Mehirdel Dep. at 123; Rizk Dep. at 60.) They disagree, however, on who was responsible for the fall. Rizk claims that Mehirdel yanked her from the patrol car by her arm, causing her to fall face forward onto the pavement. (Rizk Dep. at 59–60.) Mehirdel, in contrast, claims that she deliberately dropped to the ground, using "all her body weight and pressure to drop down so she slipped out and fell on her knees." (Mehirdel Dep. at 125.) Both parties agree that she landed on her hands and knees and sustained injury as a result. (Rizk Dep. at 60; Mehirdel Dep. at 123–24.)

Rosenthal spoke to Gonsalves, who showed him his police identification. (Rosenthal Dep. at 67–68; Gonsalves Dep. at 132.) According to Rosenthal, Gonsalves smelled of alcohol and had bloodshot eyes, but was steady on his feet. (Rosenthal Dep. at 47.) He kept putting his

hand on the sergeant's arm and "apologized profusely," although he did not say what he was sorry for. (*Id.* at 67–68.) By all accounts, Gonsalves agreed to go to the 114th Precinct for an investigation into the incident and accompanied the sergeant's driver to their patrol car, where he voluntarily sat in back. (Rosenthal Dep. at 68; Gonsalves Dep. at 133.)

Both Rizk and Mehirdel were driven to the 114th Precinct. According to Rosenthal, Gonsalves was not actually arrested until sometime after he arrived at the Precinct. (Rosenthal Dep. at 71.) The decision to arrest him was not made by Rosenthal or any of the Individual Defendants in this action but was made by the Internal Affairs Bureau and other high-ranking police officials. (*Id.*) Although Rosenthal concedes that Gonsalves was not free to leave the precinct prior to his arrest, he explains that this was because he was required to participate in the investigation of his involvement in the off-duty incident. (*Id.* at 94.)

Mehirdel prepared the arrest reports for both Gonsalves and Rizk. The report he prepared for Gonsalves charged the detective with resisting arrest, harassment in the second degree, and disorderly conduct. With respect to the latter two charges, Mehirdel claimed that Gonsalves had shoved him "with an open palm three times" while he was attempting to deescalate a physical confrontation between Gonsalves and Rizk. (Declaration of Senior Counsel Melanie Speight ("Speight Dec.") (Doc. No. 84), Ex. J.) In the report he prepared for Rizk, which charged her with obstruction of governmental administration in the second degree as well as the three offenses mentioned above, Mehirdel alleged that Rizk "did grab onto and strike [his] back while [he] was attempting to place Gonsalves under arrest." (Speight Dec., Ex. I.) An Assistant District Attorney incorporated Mehirdel's claims into the criminal court complaints on which Gonsalves and Rizk were subsequently arraigned. (*Id.*, Exs. K, L.)

8

Rizk and Gonsalves were both released on recognizance at arraignment.  (Rizk Dep. at 73; Gonsalves Dep. at 145–46.)  In October 2013, the charges against them were adjourned in contemplation of dismissal.  (Speight Dec. at M, N.)  The charges were dismissed on April 1, 2014.  (*Id.*)

The Complaint

On October 31, 2014, Plaintiffs commenced this action against the City of New York, the NYPD, and the Individual Defendants.  The complaint alleges four federal causes of action causes of action and seven state-law claims.  The first cause of action is brought pursuant to 42 U.S.C. § 1983, and alleges "numerous constitutional violations."  (Compl. (Doc. No. 1) ¶ 109.)  This count alleges that defendants falsely arrested and unlawfully imprisoned Plaintiffs, (*id.* ¶ 114), and that the Individual Defendants "fabricated evidence," (*id.* ¶ 110), and/or conspired to fabricate evidence and falsify documents, arrest paperwork, and other "official records," (*id.* ¶ 113.)  It also specifically alleges that Officers Mehirdel and Lee used excessive force, (*id.* ¶ 122), and it implies malicious prosecution claims against the two officers, alleging that they "actively instigated and encouraged the prosecution of ... Plaintiffs," (*id.* ¶ 116.)  In addition, the count alleges that defendants intentionally and maliciously failed "to follow proper policies and protocols," and that this failure violated Plaintiffs' rights under the Fourth, Fifth, Sixth, and Fourteenth amendments of the United States Constitution.  (*Id.* ¶ 111.)

The second cause of action seeks to impose liability on defendant City of New York for the civil rights violations alleged in Count One.  Plaintiffs primarily allege that the City "has permitted and tolerated a pattern and practice of unjustified, unreasonable and illegal abuses, arrests and excessive use of force by police officers."  (*Id.* ¶ 126.)  Plaintiffs suggest that this pattern and practice "caused and encouraged" the NYPD and the Individual Defendants to

believe that civil rights abuses sort alleged in this case were permitted. (*Id.*) In addition, the second cause of action alleges that the City "failed to maintain a proper system for oversight of officers and supervisors and for investigation of all incidents of unjustified arrests and excessive use of force by its agents/employees." (*Id.* ¶ 127.)

The third cause of action is brought pursuant to 42 U.S.C. § 1985 and alleges a civil rights conspiracy. It principally alleges that the Individual Defendants "expressly and implicitly agreed to bring about Plaintiffs' seizure, false arrest, detention and the use of excessive force." (*Id.* ¶ 146.)

The fourth cause of action alleges that each of the Individual Defendants failed to intervene to protect plaintiffs from the unconstitutional acts of his fellow officers. It alleges that these defendants "knew or should have known that the detainment, false arrest, wrongful imprisonment, and use of excessive force against plaintiffs" violated their federal constitutional and statutory rights, but that these defendants "failed to intervene to protect or aid ... Plaintiffs ...." (*Id.* ¶ 141.) The police employees' failure to stop these wrongful actions is alleged to "constitute a breach of their duty to do so under 42 U.S.C. §1986." (*Id.* ¶ 142.)

The remaining seven causes of action are state-law claims. The fifth cause of action advances fraudulent misrepresentation claims against Mehirdel and Lee, alleging that they knowingly and falsely represented that Gonsalves shoved Mehirdel several times after the officer exited his patrol car and that Rizk grabbed Mehirdel and struck him on the back while he was attempting to handcuff Gonsalves. (*Id.* ¶ 147.) The sixth cause of action alleges state-law false arrest/imprisonment claims against the Individual Defendants. The seventh cause of action alleges that all defendants were negligent in failing "to exercise the slightest amount of due care to secure and protect the civil and constitutional rights of the plaintiffs against illegal search and

10

seizure, false arrest, false imprisonment, use of excessive force, and other due process

violations." (*Id.* ¶ 158.)  The eighth and ninth causes of action allege assault and battery,

respectively, against the Individual Defendants.  The tenth and eleventh causes of action allege

that the Individual Defendants negligently and intentionally inflicted emotional distress on Rizk.

The Video Evidence

During discovery, the parties obtained a video of the incident.  The camera is mounted

about 10 feet above the sidewalk and approximately 20 feet behind Gonsalves' car.  Although

the camera provides a fixed view and is aimed primarily at the sidewalk, it depicts the car in a

corner of the frame.  It clearly shows that the car was parked well less than a car length from a

fire hydrant.

The video captured the entirety of the incident, albeit only in the upper right portion of

the frame.  Because of the distance between the camera and the far side of Gonsalves' car and

the relatively poor quality of the video, the video does not conclusively prove or disprove either

plaintiffs' or defendants' versions of the crucial events.  However, it does show physical contact

between Gonsalves and Rizk shortly before the officer's arrival, Rizk speaking to Mehirdel

through the patrol car window, and Mehirdel gesturing to Gonsalves.  It also shows Mehirdel

exiting the patrol car and approaching to within a foot of Gonsalves, while Lee comes around the

patrol car and stands behind and to the left of Gonsalves.

Although the video is silent, it appears that Mehirdel and Gonsalves are engaged in an

argument.  One can clearly see Gonsalves moving his arm back and forth towards Mehirdel.

However, because the camera is slightly behind Mehirdel it is impossible to see whether

Gonsalves' hand ever made contact with Mehirdel's chest.

One can also see Mehirdel and Lee attempting to handcuff Gonsalves.  At one point, Gonsalves, who had been facing his car, turns to face the officers. After that, all three men fall to the ground behind the car, obscuring the view.  One can see Rizk approaching Mehirdel from behind and attempting to reach around him, and Mehirdel turning towards her to move her back. Although she appears to approach for second time, one cannot tell whether she ever struck the officer.

Mehirdel then approaches Rizk and moves her to the back of Gonsalves' car, where he attempts to handcuff her.  Rizk appears to resist facing the car and a struggle ensues.  Eventually, Mehirdel succeeds in placing her in the back of his patrol car.  One can clearly see that Rizk's leg is still outside the car as Mehirdel attempts to close the door.  He closes the door slowly, and it is impossible to tell what, if any, injury Rizk suffered as a result.

The video also captures Mehirdel subsequently removing Rizk from the car.  While one can see Rizk falling to the ground, the view of her removal from the patrol car is obscured by Mehirdel.  Accordingly, it is impossible to tell precisely what happened.

The Instant Motion

Defendants now move for summary judgment as to all causes of action and defendants. The Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defendants' Memo") (Doc. No. 83) raises 11 points, the last of which seeks summary judgment with respect to all seven state-law claims.  In the first point, defendants argue that all claims against Lt. Howley should be dismissed because he was not personally involved in the alleged wrongdoing. In the second point, defendants argue that Officers Mehirdel and Lee had reasonable suspicion to stop plaintiffs, and were entitled to handcuff them for the officers' safety. In the third point, defendants argue that the existence of probable cause defeats plaintiffs' claims

for false arrest or, in the alternative, that Mehirdel, Lee, and Rosenthal had arguable probable cause and are therefore entitled to qualified immunity.

The fourth point seeks summary judgment with respect to plaintiffs' excessive force claims. It argues that the undisputed facts establish that Rosenthal never used force at all and that Lee never used force against Rizk. (Defendants' Memo at 16.) While tacitly conceding that Mehirdel used force to handcuff Rizk and that both Lee and Mehirdel used force to handcuff Gonsalves, defendants note that the right to arrest necessarily carries with it the right to use some degree of physical coercion and argue that plaintiffs cannot "possibly show that officers Mehirdel and/or Lee used more than the minimum force necessary to place both plaintiffs into handcuffs." (*Id.* at 17.) Defendants also argue, in the alternative, that the officers are entitled to qualified immunity with respect to their use of force in handcuffing plaintiffs, (*id.* at 17, 18), and that Rizk's claim that Mehirdel used excessive force in removing her from the police car is conclusively disproven by the video, (*id.* at 18). Finally, defendants argue that the excessive force claims must be dismissed because plaintiffs cannot prove more than de minimis injury.

In their fifth point, defendants argue that their alleged "failure to follow proper policies and protocols" did not constitute a constitutional violation and cannot serve as the basis for §1983 liability. The sixth point construes plaintiffs' allegations that individual defendants "fabricated evidence" as a claim for the denial of the right to a fair trial and argues that plaintiffs have failed to establish such a claim. The seventh point argues that plaintiffs not only failed to plead or adduce any evidence to establish malicious prosecution but are barred from raising such claim because they accepted adjournments in contemplation of dismissal.

In Point VIII, defendants argue that plaintiffs' conspiracy claims fail as a matter of law because "[t]he intra-corporate conspiracy doctrine generally bars liability when the alleged

13

conspirators work for the same organization." (*Id.* at 24.)  In addition, defendants argue that the
§ 1985 conspiracy claim must be dismissed because plaintiffs do not allege that the conspiracy
denied them "equal protection" of the laws based on their "membership in any sort of protected
class." (*Id.*)

The ninth point addresses plaintiffs' failure-to-intervene claims, noting that they are
brought both under §1983 and §1986.  With respect to the § 1983 claims, this point argues that
individual defendants cannot be simultaneously liable for participating in the unlawful conduct
and failing to intervene.  Defendants assert that "Plaintiffs' claims for failure to intervene
pursuant to section 1983 must be dismissed as to all defendants" on this basis. (*Id.* at 25.)  In the
alternative, defendants argue that the failure-to-intervene claim must fail because plaintiffs
cannot establish the existence of any constitutional violations or because the officer defendants
reasonably believed that no such violations occurred.  (*Id.*)  Finally, Defendants argue that a
§1986 claim must be predicated on a valid §1985 claim, and that plaintiffs have not established a
conspiracy under § 1985.

Point X seeks summary judgment with respect to the second cause of action.  Defendants
argue that plaintiffs have not established that the City has "permitted and tolerated" a widespread
pattern and practice of constitutional violations by its police force.  They also argue that
plaintiffs have not established that municipal policymakers had actual or constructive notice that
a deficiency in their training/supervision program was causing municipal employees to violate
citizens' constitutional rights and that municipal policymakers chose to retain the deficient
program.

Point XI seeks summary judgment with respect to all of plaintiff's state-law claims.
First, defendants argue that plaintiffs have neither alleged nor proved the elements of fraudulent

misrepresentation under New York law.  Second, they argue that the state law claims for false arrest/imprisonment fail because probable cause or arguable probable cause existed to arrest both plaintiffs.  Third, defendants claim that plaintiffs cannot maintain viable claims for assault and battery because the officer defendants used reasonable, not excessive, force in effecting lawful arrests.  Fourth, defendants assert that the state law negligence claims are inconsistent with plaintiffs' unequivocal allegations that "defendants acted intentionally and within the scope of their employment at the time of the incident."  (*Id.* at 32.)  Fifth, defendants seek to dismiss Rizk's claims for negligent infliction and intentional infliction of emotional distress, arguing, among other things, that plaintiffs cannot establish the "extreme and outrageous conduct" required to state these claims.  (*Id.* at 33.)  Sixth, defendants argue that the respondeat superior claims must be dismissed because "plaintiffs have failed to establish any underlying tortious conduct for which [the] City could be vicariously liable."  (*Id.* at 34.)

In their Memorandum of Law in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Memo") (Doc. No. 85), plaintiffs withdraw all claims against Lt. Howley and their claims for malicious prosecution and municipal liability. Accordingly, there is no need consider the argument raised in Point I, VII, and X of Defendants' Memo.

Plaintiffs' Memo addresses most, but not all, of the other points raised in Defendants' Memo. With respect to Points II and III, plaintiffs argue that genuine issues of material fact preclude the Court from finding as a matter of law that defendants had probable cause or arguable probable cause to arrest plaintiffs.  Plaintiffs also expressly address Points IV and V, arguing that summary judgment should not be granted with respect to the excessive force and fair trial claims.  In addition, plaintiffs address Point IX, arguing that their failure-to-intervene

15

claim should not be dismissed, and address half of the arguments raised in Point XI: the argument relating to assault and battery, intentional infliction of emotional distress and respondeat superior.  However, Plaintiffs' Memo does not address the other arguments raised in Point XI:  the arguments relating to plaintiffs' fraudulent misrepresentation, negligence, and negligent infliction of emotional distress claims.  It also does not address Point V, seeking to dismiss that portion of Count I which seeks to impose §1983 liability for failure to follow proper protocol/procedures, and Point VIII, relating to the §§ 1983 and 1985 conspiracy claims.

## STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (quoting *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013)).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).  "[T]he nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id.*

"Rule 56 does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion, or relevant part, is unopposed." *Jackson v.*

*Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014). "[T]he failure to respond to the motion does not alone discharge the burdens imposed on a moving party." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Wilson v. Air Serv Corp.*, 705 F. App'x 43, 44 (2d Cir. 2017) (summary order) (quoting *Vermont Teddy Bear Co.*, 373 F.3d at 244). In addition, "the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Id.* (quoting *Vermont Teddy Bear Co.*, 373 F.3d at 242).

## DISCUSSION

I. <u>The Section 1983 Claim</u>

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements. First, the conduct challenged must have been "committed by a person acting under color of state law." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Calla*n, 13 F.3d 545, 547 (2d Cir. 1994)); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." (internal quotation marks and citation omitted)). Second, the conduct complained of "must have deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Cornejo*, 592 F.3d at 127 (quoting *Pitchell*, 13 F.3d at 547); *see also Moore v. Toulon*, No. 18-CV-5276 (JMA) (ARL), 2019 WL 885932, at *2 (E.D.N.Y. Feb. 22, 2019). In addition, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.'" *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

A.   <u>Failure to Follow Proper Policies and Protocols</u>

Plaintiffs' first cause of action, which is brought pursuant to 42 U.S.C. § 1983, alleges numerous federal constitutional violations:  false arrest/unlawful imprisonment, excessive force, violation of the right to a fair trial by fabricating evidence, and malicious prosecution.  (Compl. ¶ 109.)  All of these – with the exception of the malicious prosecution claim, which has been withdrawn by plaintiffs – are addressed below.  However, the first cause of action also alleges that defendants intentionally and maliciously failed "to follow proper policies and protocols," and that this failure violated plaintiffs' rights under the United States Constitution.  (*Id.* ¶ 111.)

To the extent that plaintiffs are attempting to base a § 1983 claim based on the violation of police policies and protocols, that claim is dismissed.  Section 1983 "does not provide a remedy for violations of best police practices."  *Bah v. City of New York*, No. 13-CV-6690 (PKC), 2017 WL 435823, at *6 (S.D.N.Y. Jan. 31, 2017).  "A violation of the Patrol Guide or departmental policy does not, in and of itself, amount to the violation of a right protected by the Constitution or federal law."  *Id.* (citing *United States v. Wilson*, 699 F.3d 235, 238, 243 (2d Cir. 2012)).  Accordingly, an act or omission that violates police policy but does not also violate constitutional rights is not actionable under § 1983.  *See Wilson*, 699 F.3d at 243 (finding that since the "Fourth Amendment does not generally incorporate local statutory or regulatory restrictions on seizures," the "violation of such restrictions will not generally affect the constitutionality of a seizure supported by probable cause").

Plaintiffs' complaint does not specifically identify the "policies and protocols" mentioned in Count One.  Presumably, plaintiffs are alleging that police policies or protocols permitted the

18

other unconstitutional violations alleged in Count One.  If so, this argument is essentially
duplicative of the constitutional claims contained below and the *Monell* claim contained in
plaintiffs' second cause of action.[1]   If plaintiffs are alluding to other constitutional violations,
they have failed to provide adequate notice of their claim.  *See* Fed. R. Civ. P. 8(a).

B.  False Arrest and False Imprisonment

"A section 1983 claim for false arrest is substantially the same as a claim for false arrest
under New York law." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citing
*Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).  In addition, "false arrest is a species of false
imprisonment," such that the two share the same elements under New York law.  *Shaheed v. City
of New York*, 287 F. Supp. 3d 438, 448 (S.D.N.Y. 2018) (quoting *Singer v. Fulton Cty. Sheriff*,
63 F.3d 110, 118 (2d Cir. 1995).  To prove a claim for false arrest or false imprisonment the
plaintiff must show that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff
was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the
confinement was not otherwise privileged."  *Singer*, 63 F.3d at 118 (quoting *Broughton v. State
of New York*, 37 N.Y.2d 451, 456 (1975)).  "A confinement is privileged where the arresting
officer has probable cause to arrest."  *Shaheed*, 287 F. Supp. 3d at 448 (citing *Jocks v. Tavernier*,
316 F.3d 128, 135 (2d Cir. 2003)).  Thus, "[t]he existence of probable cause to arrest … 'is a
complete defense to an action for false arrest' [and imprisonment] … under state law or under §
1983." *Jenkins*, 478 F.3d at 84 (quoting *Weyant*, 101 F.3d at 852).  "[P]robable cause to arrest
exists when the officers have knowledge or reasonably trustworthy information of facts and

---

[1] Since "[t]he NYPD is a non-suable agency of the City," *Jenkins v. City of New York*, 478 F.3d 76, 93 n.17 (2d Cir.
2007), claims against the NYPD are actually claims against the City.  Since plaintiffs have withdrawn their *Monell*
claim, both the City and the NYPD are dismissed from this action.

19

circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852.

In this case, defendants do not argue that Officers Mehirdel and Lee had probable cause to arrest either Gonsalves or Rizk when they first arrived on the scene.  Rather, they argue that the officers initially "had reasonable suspicion to conduct a *Terry* stop and briefly detained plaintiffs in order to determine whether any criminal activity was afoot."  (Defendants' Memo at 9.)  They argue that probable cause developed during the stop when Gonsalves made "physical contact with Officer Mehirdel's chest using his finger(s)" and when "Rizk attempted to interfere in the arrest of plaintiff Gonsalves."  (*Id.* at 10.)

The Court agrees with defendants that the officers initially had reasonable suspicion to justify a *Terry* stop, even though they initially lacked probable cause to arrest.  Both officers testified that the driver of a black SUV and pedestrians on Steinway Street informed them that a couple was "fighting" further up the block.  Moments later, the officers encountered Rizk and Gonsalves standing in the street, yelling at one another.  Mehirdel also saw Rizk pulling her arm from Gonsalves' grasp.  Given the physical dimension of the conflict, the officers were entitled to conduct a further investigation.  However, neither officer had himself witnessed behavior that would give probable cause to arrest for harassment in the second degree or disorderly conduct.

The officers' reasonable suspicion alone did not justify the decision to handcuff Gonsalves.  To satisfy the Fourth Amendment's reasonableness requirement, "officers conducting stops on less than probable cause must employ 'the least intrusive means reasonably available' to effect their legitimate investigative purposes."  *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)).  This rule "does not operate categorically to authorize or prohibit particular forms of restraint in

conjunction with an investigatory stop." *United States v. Bailey*, 743 F.3d 322, 339 (2d Cir. 2014). "Rather, it demands a careful consideration of the circumstances in which challenged restraints were used." *Id.* at 339–40.

Defendants' Memo does not suggest that Gonsalves or Rizk did anything that would justify handcuffing them until they committed the acts which, according to defendants, gave rise to probable cause. Mehirdel claims that he "felt threatened" when Gonsalves initially approached the patrol car, yelling. (Mehirdel Dep. at 143.) This allegedly prompted him to step out of car but Mehirdel was not so concerned for his safety that he felt it necessary to handcuff Gonsalves immediately. By this own account, he did not feel it necessary to handcuff Gonsalves for the officers' safety until after Gonsalves poked him in the chest. (*Id.* at 75, 143.) Similarly, there is nothing to suggest that he believed Rizk posed any threat to the officers' safety until she made contact with his back.

Defendants also argue that Mehirdel had probable cause to arrest for a parking violation, since Gonsalves' vehicle was less than 15 feet from a fire hydrant. (Defendants' Memo at 11.) Indeed, the video evidence shows that the gray sedan was parked illegally. However, defendants have not introduced any evidence that Mehirdel knew that the gray sedan belonged to Gonsalves. Defendants assert that Mehirdel saw car keys in Gonsalves' hand when the officers first arrived, but they have offered no evidence that Mehirdel knew that the keys belonged to the gray sedan.

Mehirdel claims that he had probable cause to arrest after Gonsalves poked him in the chest and after Rizk struck his back. However, both plaintiffs denying that they made contact with Mehirdel. These genuine issues of material fact preclude the Court from determining that probable cause or arguable probable cause existed to arrest Gonsalves or Rizk. Accordingly, defendants' motion for summary judgment with respect to the § 1983 false arrest/false

21

imprisonment claims is denied.  For the same reason, defendants' motion for summary judgment with respect to the state law false arrest/false imprisonment claims is also denied.

C. <u>Excessive Force</u>

Defendants advance five separate arguments in support of their motion for summary judgment with respect to the excessive force claims.  The first two are clearly meritorious.  First, there is no evidence that Sgt. Rosenthal ever used force against either plaintiff.  Accordingly, any excessive force claim against defendant Rosenthal is dismissed.  Second, there is no evidence that Lee ever used force against Rizk.  Therefore, Rizk's excessive force claims against Lee are also dismissed.

The remaining claims require more discussion.  "It is well-settled that '[t]he right to make a lawful arrest carries with it the right to use reasonable force to effectuate that arrest.'" *Lin v. Cty. of Monroe*, 66 F. Supp. 3d 341, 358 (W.D.N.Y. 2014) (quoting *Lieberman v. City of Rochester*, No. 07-CV-6316, 2011 WL 13110345, at *4 (W.D.N.Y. Apr. 29, 2011), *aff'd*, 558 F. App'x 38 (2d Cir. 2014)).  In addition, "[t]he fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some* degree of force, but it does not give the officer license to use force without limit." *Sullivan v. Gagnier*, 225 F.3d 161, 165–66 (2d Cir. 2000) (emphasis in original).  The force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." (*Id.*)

Although defendants argue that "neither plaintiff ... could possibly show that Officers Mehirdel and/or Lee used more than the minimum force necessary to place both plaintiffs into handcuffs," (Defendants' Memo at 17), there is a genuine issue of material fact as to whether the officers were making a lawful arrest and, if they were, whether the officers used more force than

necessary.  As discussed above, there is a genuine issue of material fact with respect to whether probable cause existed.  There is also a genuine issue of material fact with respect to appropriateness of the amount of force used.  Gonsalves testified that Lee twisted his hand to such a degree that he had to pull away from the officers for fear of injury.  (Gonsalves Dep. at 127.)  He also testified that he saw Mehirdel "basically manhandling" Rizk or "roughing her up" in the process of attempting to handcuff her.  (Gonsalves Dep. at 129, 130, 132.)  In light of this evidence, the Court cannot find as a matter of law that the officers' use of force was reasonable under the circumstances.  For the same reason, the Court also cannot determine at this juncture whether the officers are entitled to qualified immunity.

Defendants assertion that "the surveillance video puts the lie" to Rizk's claims of excessive force is simply incorrect.  First, as noted above, it is difficult to determine whether Rizk struck Mehirdel on the back, giving the officer probable cause to arrest her.  Second, the video clearly shows Mehirdel using considerable force in handcuffing her and closing the patrol car door on her leg.  Third, there is a genuine issue of material fact as to why Rizk fell to the ground when Mehirdel removed her from the patrol car in order to replace the handcuffs.  The video does not resolve that issue of fact.

Finally, the Court rejects defendants' argument that the excessive force claims must be dismissed because plaintiffs cannot prove more than de minimis injury.  The requirement that a plaintiff show more than de minimis injury is often applied in Eighth Amendment excessive force cases involving convicts in prison facilities.  In Eighth Amendment cases, "the plaintiff must establish that the deprivation alleged is 'sufficiently serious,' or 'harmful enough,' to reach constitutional dimensions." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).  "[A] de minimis use of force will rarely suffice to state a constitutional claim." *Id.*

23

Here, where plaintiffs allege excessive use in the course of an arrest or attempted arrest, the excessive force claims are based on the Fourth Amendment. *See Tierney v. Davidson*, 133 F.3d 189, 199 (2d Cir. 1998). Many circuit courts have expressly rejected the view that Fourth Amendment excessive force cases can be dismissed because the injury was only de minimis. *See*, *e.g.*, *United States v. Rodella*, 804 F.3d 1317, 1328-29 (10th Cir. 2015) ("[W]e reject the ... premise ... that there is a de minimis injury requirement for Fourth Amendment excessive force claims in cases which involve more than handcuffing."); *Smith v. Murphy*, No. 14-1918, 2015 WL 7351758, at *3 (4th Cir. Nov. 20, 2015) ("[We] [f]ind[ ] no support for Defendants' contention that suffering only de minimis injuries bars one from asserting a Fourth Amendment excessive force claim ...."); *Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) (a plaintiff claiming excessive force under the Fourth Amendment can seek nominal damages if he does not have compensable injuries); *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011) ("We are not convinced ... that evidence of only de minimis injury necessarily forecloses a claim of excessive force under the Fourth Amendment.")

To be sure, some district courts in this circuit have dismissed Fourth Amendment excessive force claims on the grounds that the plaintiff's injuries were de minimis. *See, e.g.*, *Rincon v. City of New York*, No. 03 Civ. 8276 (LAP), 2005 WL 646080, at *5 (S.D.N.Y. Mar. 21, 2005) (rejecting claim of excessive force based on a de minimis injury where plaintiff alleged that the officer threw her to the ground, causing her stitches to open and her leg to bleed); *Cunningham v. Rodriguez*, No. 01 Civ. 1123 (DC), 2002 WL 31654960, at *5-6 (S.D.N.Y. Nov. 22, 2002) (rejecting excessive force claim where plaintiff's injury, muscle pain from hits to the face and back, were considered de minimis ); *Bove v. New York City*, No. 98-CV-8800 (HB), 1999 WL 595620, at *6 (S.D.N.Y. Aug. 6, 1999) (rejecting excessive force claim where plaintiff

failed to produce medical records of his injuries and the only documented injury was a bruised head).  However, other district courts have reached the opposite conclusion.  *See*, *e.g.*, *Jackson on Behalf of Z.J. v. City of Middletown*, No. 3:11-CV-00725 (JAM), 2017 WL 2218304, at *4 (D. Conn. May 19, 2017) (rejecting the view that the absence of more than a de minimis injury necessarily forecloses a claim of excessive force under the Fourth Amendment); *Barcomb v. Kraeger*, No. 14-CV-1159 (JBA), 2016 WL 2644885, at *4–5 & n.8 (D. Conn. 2016) (rejecting more-than-de-minimis-injury requirement for Fourth Amendment excessive force claims); *Gilliard v. City of New York*, No. 10-CV-5187 (NGG) (CLP), 2013 WL 521529, at *12, n.9 (E.D.N.Y. Feb. 11, 2013) ("[T]he court is not convinced that de minimis injuries preclude an excessive force claim based upon the Fourth Amendment as a matter of law.")  In light of the number of circuit courts which have endorsed the latter view, and the lack of Second Circuit authority deciding the issue, the Court concludes that Fourth Amendment excessive force claims cannot be dismissed solely for failure to establish more than de minimis injury.

D.  <u>Denial of the Right to a Fair Trial</u>

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983."  *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).  "*Ricciuti*'s holding applies to falsified information contained in an officer's account of his or her observations of alleged criminal activity which he or she conveys to prosecutors."  *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016).  However, "the standard in *Ricciuti* restricts fair trial claims based on fabrication of information to those cases in which an (1) investigating official (2) fabricates information (3) that is likely to influence a

25

jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Id.* at 279.

Although Plaintiffs' Memo principally addresses the fifth element, defendants do not argue that plaintiffs were not deprived of liberty. Rather, defendants argue 1) that plaintiffs allege no facts implicating any defendants other than Mehirdel in this constitutional violation and 2) that plaintiffs claim that Mehirdel falsified official documents by stating that Gonsalves shoved him in the chest is conclusively disproved by the surveillance video. (Defendants' Memo at 21.)

Plaintiffs have not addressed the first of these arguments, and the complaint does not allege that any defendant other than Mehirdel fabricated information and forwarded it to prosecutors. Accordingly, the Court finds that plaintiffs fair trial claim is brought solely against Mehirdel. To the extent that the complaint can be read as alleging a fair trial claim against any other defendant, such claims are dismissed for failure to establish personal involvement.

With respect to defendants' second argument, the Court does not find that the surveillance video conclusively proves that Mehirdel's statements in Gonsalves' criminal complaint were not fabricated. In his arrest report, Mehirdel claimed that Gonsalves had shoved him "with an open palm three times." (Speight Decl., Ex. J (Doc. No. 84-11) at 3.) While the video appears to show Gonsalves repeatedly moving his right hand back and forth in the vicinity of Mehirdel's chest, Gonsalves appears to be pointing with his finger rather than extending his open palm. Indeed, at his deposition, Mehirdel himself testified that Gonsalves poked him in the chest once, using two fingers. Moreover, even this claim cannot be corroborated by the video, which does not show whether Gonsalves' fingers made contact with Mehirdel's chest.

Similarly, the video does not conclusively establish that Rizk "grabbed" Mehirdel and "struck him on his back" as he was attempting to handcuff Gonsalves.  To be sure, the video appears to show Rizk making contact with Mehirdel as he is wrestling with Gonsalves.  However, the picture quality is inadequate to permit the court to conclusively determine that Rizk grabbed or struck Mehirdel.  Accordingly, the Court cannot award summary judgment to Mehirdel with respect to the fair trial claim.

 E. <u>Conspiracy</u>

Defendants argue that, to the extent plaintiffs are advancing § 1983 conspiracy claims against defendants, these claims are barred by the "intra-corporate conspiracy doctrine."  The Supreme Court has used this doctrine to bar conspiracy claims in some civil contexts, "holding that because employees acting within the scope of their employment are agents of their employer, an employer and its employees are generally considered to be a single actor, rather than multiple conspirators."  *Fed. Ins. Co. v. United States*, 882 F.3d 348, 368 (2d Cir. 2018).  The Second Circuit has extended the doctrine "to the context of conspiracies to interfere with civil rights in violation of 42 U.S.C. § 1985."  *Id.* (citing *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 70 (2d Cir. 1976)).

"Although the Second Circuit has not specifically addressed the applicability of the intracorporate conspiracy doctrine to a § 1983 conspiracy claim, district courts within the Circuit have applied the doctrine to such claims."  *Oliver v. New York State Police*, No. 15-CV-444 (BKS) (DJS), 2020 WL 1989180, at *49 (N.D.N.Y. Apr. 27, 2020).  Indeed, several district courts have applied the doctrine to bar § 1983 conspiracy claims against various members of the same police department.  *See, e.g.*, *Oliver*, 2020 WL 1989180, at *50 (defendants, all of whom were members of the New York State police, could not "conspire" against plaintiff within the

meaning of §§ 1983 or 1985); *Dowd v. DeMarco*, 314 F. Supp. 3d 576, 587 (S.D.N.Y. 2018)

(applying doctrine to bar § 1983 conspiracy claim against members of the NYPD); *Danielak v.*

*City of New York*, No. 02-CV-2349 (KAM), 2005 WL 2347095, at *14 (E.D.N.Y. Sept. 26,

2005) (holding that the intra-corporate conspiracy doctrine barred plaintiff's § 1983 conspiracy

claims because all of the individual defendants were employees of the NYPD, and were acting

within the scope of their employment as police officers when they arrested plaintiff).  There is an

exception to the intra-corporate conspiracy doctrine: it does not apply when the individuals are

"pursuing personal interests wholly separate and apart from the entity."  *Ali v. Connick*, 136 F.

Supp. 3d 270, 282–83 (E.D.N.Y. 2015).  This "personal stake" exception applies "where law

enforcement allegedly exercises official duties in unconstitutional ways in order to secure

personal benefit."  *Rudavsky v. City of S. Burlington*, No. 2:18-CV-25, 2018 WL 4639096, at *6

(D.Vt. Sept. 27, 2018) (citing *Alvarez v. City of New York*, No. 11 Civ. 5464 (LAK), 2012 WL

6212612, at *3 (S.D.N.Y. Dec. 12, 2012)).

 In this case, the Individual Defendants are all members of the NYPD.  To the extent

plaintiffs are advancing § 1983 conspiracy claims against defendants, these claims are barred by

the intra-corporate conspiracy doctrine.  Plaintiffs – who have not responded to defendants'

arguments for summary judgment on the conspiracy claims, have not established, or even

alleged, that any of the individual defendants possessed an independent, personal conspiratorial

purpose or interest in plaintiffs' arrest wholly separate and apart from the NYPD.  Accordingly,

the Court grants summary judgment in defendants' favor with respect to the § 1983 conspiracy

claims against all defendants.

F. Failure to Intervene

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Sloley v. VanBramer*, 945 F.3d 30, 46–47 (2d Cir. 2019) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  "An officer may be held liable for preventable harm caused by the actions of other officers, if '(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene.'" *Jackson v. City of New York*, 939 F. Supp. 2d 219, 232 (E.D.N.Y. 2013) (quoting *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)).  Obviously, a person who is held liable under a theory of direct participation in the constitutional violation cannot also be held liable for a failure to intervene.  *See id.* (citing *Chepilko v. City of New York*, No. 06-CV-5491, 2012 WL 398700, at *8 n.5 (E.D.N.Y. Feb. 6, 2012)).

Defendants first argue that because Mehirdel, Lee, and Rosenthal "are all alleged to have directly participated in the conduct underlying all but one of plaintiff's claim[s] enumerated in count one, no claim for failure to intervene can lie ... against any of these defendants for these same violations."  (Defendants' Memo at 25.)  While Defendants are correct that individual law enforcement officers may not be held liable for failure to intervene where they are liable under a direct theory of participation, *see Jackson*, 939 F. Supp. 2d at 232, plaintiffs are permitted to plead in the alternative.  *See Amid v. Lamb*, No. 14-CV-3151, 2016 WL 1070814, at *5

(E.D.N.Y. Mar. 15, 2016).  Accordingly, the Court declines to dismiss plaintiffs' claims for failure to intervene as to all defendants on this basis.[2]

Second, defendants argue that plaintiffs' failure-to-intervene claims must be dismissed because they "cannot establish the existence of any ... constitutional violations."  (Defendants' Memo at 25.)  The Court has denied defendants' motion for summary judgment with respect to most of the constitutional violations alleged in plaintiffs' first cause of action.  Accordingly, the Court cannot dismiss plaintiffs' failure to intervene claims on this basis either.

II.    The § 1985 Conspiracy Claim

In their third cause of action, plaintiffs allege that defendants conspired to deprive them of equal protection in violation of 42 U.S.C. § 1985(3).  "In order to make out a Section 1985(3) claim, 'the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.'"  *Robinson v. Allstate Ins. Co.*, 508 F. App'x 7, 9 (2d Cir. 2013) (quoting *United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 828–29 (1983)).  "[A] plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end."  *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003).  Furthermore, the "conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory

---

[2] Defendants do not argue that the undisputed evidence does not support a failure to intervene claim against certain defendants, with respect to some or all of the alleged constitutional violations.  The court declines to reach this issue *sua sponte*.  Defendants are free, however, to make that argument following the close of evidence at trial.

animus behind the conspirators' action." *Britt v. Garcia*, 457 F.3d 264, 270 n.4 (2d Cir. 2006) (internal quotation marks omitted).

As defendants correctly note, plaintiffs' § 1985(3) claim fails for at least three reasons. First, as noted in the preceding section, the Second Circuit has extended the intra-corporate conspiracy doctrine "to the context of conspiracies to interfere with civil rights in violation of 42 U.S.C. § 1985." *Fed. Ins. Co.*, 882 F.3d at 368 (2d Cir. 2018) (citing *Girard*, 530 F.2d at 70). Plaintiffs' § 1985(3) claim is barred by that doctrine for the same reason that plaintiffs' § 1983 conspiracy claim is barred.

Second, even if the intra-corporate conspiracy doctrine did not apply, there is no evidence that defendants entered into an agreement, express or tacit, to achieve an unlawful end. Plaintiffs' evidence, if credited, establishes that Mehirdel committed various acts which violated plaintiffs' constitutional rights. However, there is no evidence of an agreement between Mehirdel and any other defendant.

Third, even if such an agreement existed, there is no evidence that the alleged conspiracy was "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus." *Britt*, 457 F.3d at 270 n.4. Indeed, there is not even evidence that either plaintiff was a member of a protected class. Accordingly, plaintiffs' third cause of action, alleging a § 1985(3) conspiracy, is dismissed.

### III.   The Section 1986 Claim

Plaintiff's fourth cause of action advances a claim under 42 U.S.C. § 1986. That section provides, in pertinent part:

> Every person who, having knowledge that any of the wrongs
> conspired to be done, and mentioned in section 1985 of this title,
> are about to be committed, and having power to prevent or aid in
> preventing the commission of the same, neglects or refuses so to

> do, if such wrongful act be committed, shall be liable to the party
> injured, or his legal representatives, for all damages caused by such
> wrongful act, which such person by reasonable diligence could
> have prevented ….

"[P]laintiffs' § 1986 claim is necessarily predicated on their § 1985(3) claim." *L.K. v. Sewanhaka Cent. High Sch. Dist.*, 641 F. App'x 56, 59 (2d Cir. 2016) (summary order) (citing *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 2000)).  In other words, a "claim under 42 U.S.C. § 1986 for failure to prevent the violation of a person's civil rights may not exist absent a viable section 1985 claim." *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 356 (N.D.N.Y. 2014).

For the reasons explained in the section II, above, plaintiffs do not have a viable § 1985 claim.  Accordingly, plaintiffs' fourth cause of action must also be dismissed.

IV.    State-law Claims

A.    Fraudulent Misrepresentation

"To state a claim for fraudulent misrepresentation under New York law 'a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'" *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 186–87 (2d Cir. 2004) (quoting *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995).  "Federal Rule of Civil Procedure 9(b) requires that, to be pursued in federal court, any such claims be pleaded with particularity; that is, they must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Cortes v. 21st Century Fox Am., Inc.*, 751 F. App'x 69, 72 (2d Cir. 2018) (summary order) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006).

In this case, plaintiffs have neither adequately alleged nor proved a fraudulent misrepresentation claim.  The complaint alleges that Mehirdel and Lee made false representations about plaintiff's actions during the August 3, 2013, incident which induced the trial court and the Queens County District Attorney to prosecute plaintiffs.  (Compl. ¶¶ 147 – 48.)  As defendants correctly note, the complaint does not allege that defendants intended to defraud plaintiffs, that plaintiffs reasonably relied on a fraudulent representation made by defendants, or that plaintiffs incurred injury as a result of that reliance.  (Defendants' Memo at 30.)  In addition, plaintiffs have not responded to defendants' argument that they lacked proof to establish these elements.  Accordingly, plaintiffs' fraudulent misrepresentation claim is dismissed.

  B.  <u>False Arrest and False Imprisonment</u>

As explained in section I(B), above, "[t]he existence of probable cause to arrest … 'is a complete defense to an action for false arrest' [and imprisonment] … under state law or under § 1983." *Jenkins*, 478 F.3d at 84 (quoting *Weyant*, 101 F.3d at 852).  In moving for summary judgment on plaintiff's false arrest and false imprisonment claims, defendants argue that probable cause or arguable probable cause existed to arrest both plaintiffs.  (Defendants' Memo at 31.)  Since the Court has already determined that genuine issues of material facts prevent the Court from determining whether probable cause existed, this argument fails for the same reasons explained in section I(B).

  C.  <u>Assault and Battery</u>

Defendants' motion for summary judgment with respect to plaintiffs' assault and battery claims not only turns on the issue of whether probable cause exists, but also on the question of whether excessive force was used in effecting the arrests.  "A lawful arrest is not an assault or

battery under New York law, provided the force used is reasonable." *Figueroa v. Mazza*, 825

F.3d 89, 105 n.13 (2d Cir. 2016) (citing *Cunningham v. United States*, 472 F.Supp.2d 366, 381

(E.D.N.Y. 2007)).  "An arrest is lawful if made pursuant to a warrant or based upon probable

cause." *Boyler v. City of Lackawanna*, 287 F. Supp. 3d 308, 325–26 (W.D.N.Y. 2018), *aff'd*,

765 F. App'x 493 (2d Cir. 2019), *cert. denied sub nom. Boyler v. City of Lackawanna, New York*,

140 S. Ct. 63 (2019); *Stone v. Port Authority of New York and New Jersey*, No. 11-CV-3932

(SMG), 2014 WL 3110002, at *6 (E.D.N.Y. July 8, 2014).  Conversely, "[i]f an arrest is

determined to be unlawful, any use of force against a plaintiff may constitute an assault and

battery, regardless of whether the force would be deemed reasonable if applied during a lawful

arrest." *Id.* (quoting *5 Borough Pawn, LLC. v. Marti*, 753 F. Supp. 2d 186, 201 (S.D.N.Y.

2010)).

When assault and battery claims are brought against law enforcement personnel who had

probable cause to arrest, "assault and battery claims under New York law parallel the Fourth

Amendment standard governing the use of force incident to a lawful arrest." *Tianshu Li v.

United States*, No. 05-CV-6237 (NRB), 2009 WL 3321014, at *1 n.2 (S.D.N.Y. Oct. 8, 2009)

(citing *Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991)).  "[E]xcept for § 1983's requirement

that the tort be committed under color of state law, the elements for a claim of assault and battery

against law enforcement officers under New York law and a claim of excessive force under §

1983 are the same." *Cabral v. City of New York*, No. 12-CV-4659 (LGS), 2014 WL 4636433, at

*10 (S.D.N.Y. Sept. 17, 2014) (quotation marks and citation omitted), *aff'd*, 662 F. App'x 11 (2d

Cir. 2016).

As explained in section I(C), genuine issues of material facts preclude the Court from determining whether defendants used excessive force in this case.  Accordingly, defendants' motion for summary judgment with respect to the assault and battery claim is denied.

### D. Negligence

Although a plaintiff is "generally permitted to plead different causes of action in the alternative, other District Courts in this Circuit have held that when a plaintiff's factual allegations are 'only consistent with a theory of intentional, or perhaps reckless, conduct,' negligence claims must be dismissed." *Lozada v. Weilminster*, 92 F. Supp. 3d 76, 107 (E.D.N.Y. 2015) (citing *Eze v. City Univ. of N.Y. at Brooklyn Coll.*, No. 11-CV-2454 (JG) (CLP), 2011 WL 6780652, at *6 (E.D.N.Y. Dec. 27, 2011) (collecting cases)).  Thus, "[w]hen a plaintiff asserts excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." *Warr v. Liberatore*, 270 F. Supp. 3d 637, 655 (W.D.N.Y. 2017) (quoting *Dineen ex rel. Dineen v. Stramka*, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002).

In this case, there is no view of the evidence that would permit a finding of negligence.  If the officer defendants were not acting as reasonable police officers should – *i.e.*, using excessive force or seizing plaintiffs without probable cause – they will be liable for intentional torts: violations of §1983 and intentional state law torts such as false arrest/imprisonment and assault and battery.  Accordingly, defendants are granted summary judgment with respect to plaintiffs' state law negligence claim.

### E. Intentional Infliction of Emotional Distress

Under New York law, a claim for intentional infliction of emotional distress ("IIED") requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless

35

disregard of a substantial probability of severe emotional distress. *See Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993). "As New York's highest court has observed, the standard for stating a valid claim of intentional infliction of emotional distress is 'rigorous, and difficult to satisfy.'" *Conboy v. AT & T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (quoting *Howell*, 81 N.Y.2d at 122). "'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (quoting *Howell*, 81 N.Y.2d at 122)).

"The Second Circuit has looked to New York state courts for guidance as to what conduct rises to the level of IIED, and has found that IIED claims are only sustained when they involve 'some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, permanent loss of employment, or conduct contrary to public policy.'" *Mestecky v. New York City Dep't of Educ.*, No. 13-CV-4302 (CBA) (VMS), 2018 WL 10509483, at *9 (E.D.N.Y. Sept. 7, 2018) (quoting *Stuto*, 164 F.3d at 828 (surveying New York state court IIED cases)). At least one Second Circuit case involving false accusations of criminal conduct bears some similarity to this case. In *Bender v. City of New York*, 78 F.3d 787, 791 (2d Cir. 1996), the Second Circuit held the behavior of a police officer who struck the plaintiff in the mouth, then filed false charge that the plaintiff assaulted him, resulting in 24 hours of imprisonment without reasonable cause, was sufficiently outrageous to satisfy the conduct element of the emotional distress tort. Although some district courts have observed that "false accusations of criminal conduct generally do not rise to the level of extreme and outrageous conduct that is necessary to support an IIED claim," *Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 214 (W.D.N.Y. 2013), other district courts "have allowed IIED causes of action

36

to proceed for the making of false reports … and for plotting to make, and making of, false statements about the conduct of a plaintiff." *Sylvester v. City of New York*, 385 F. Supp. 2d 431, 441–42 (S.D.N.Y. 2005).

In this case, plaintiffs have adduced evidence which, if credited by the jury, would establish that Mehirdel assaulted plaintiffs without justification, then filed false charges that resulted in their being detained at the 114th Precinct.  In light of *Bender*, the court cannot find that this proof is insufficient to establish IIED.  Conversely, there is no evidence of arguably outrageous conduct on the part of any other defendant except Mehirdel.  Accordingly, defendant's motion for summary judgment with respect to the IIED claim is denied with respect to Mehirdel, and granted with respect to the remaining defendants.

F. Negligent Infliction of Emotional Distress

It is unclear whether the extreme and outrageous element is also an element of negligent infliction of emotional distress.  The Appellate Division, First Department, has recently held that "[e]xtreme and outrageous conduct continues to be an essential element of a cause of action alleging negligent infliction of emotional distress." *Xenias v. Roosevelt Hosp.*, 120 N.Y.S.3d 298, 299–300 (N.Y. App. Div. 2020) (citing *Holmes v. City of New York*, 178 A.D.3d 496, 496 (N.Y. App. Div. 2019).  However, the Appellate Division, Second Department, has reached the opposite conclusion, noting that "the Court of Appeals' formulation of the cause of action alleging negligent infliction of emotional distress … makes no mention of extreme and outrageous conduct." *Taggart v. Costabile*, 131 A.D.3d 243, 255 (N.Y. App. Div. 2015).

The Court does not need to resolve this split of authority.  As noted in section IV(D), above, there is no view of the evidence that would permit the jury to find that the actions that allegedly caused emotional distress to the plaintiffs were negligent, rather than intentional.

Accordingly, the Court grants defendants' motion for summary judgment with respect to plaintiffs' tenth cause of action.

     G.  Respondeat Superior

"Under New York law, '[t]he doctrine of respondeat superior renders an employer vicariously liable for torts committed by an employee acting within the scope of the employment." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 446, n.7 (2d Cir. 2015) (quoting *RJC Realty Holding Corp. v. Republic Franklin Ins. Co.*, 808 N.E.2d 1263, 1265–66 (N.Y. 2004)).  Under this doctrine, "the employer may be liable when the employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable and a natural incident of the employment." *Id.*  The respondeat superior claim, therefore, depends on the plaintiff establishing a state-law tort claim.  *See Bellamy v. City of New York*, 914 F.3d 727, 744, n.17 (2d Cir. 2019).

Defendants argue that plaintiffs' respondeat superior claim must be dismissed because plaintiffs do not have any viable state-law claims.  For the reasons set forth above, the premise of defendants' argument is faulty; plaintiffs do have viable state law claims.  Accordingly, defendants' motion for summary judgment with respect to the respondeat superior claim is denied.

**CONCLUSION**

For the reasons set forth above, defendants' motion for summary judgment is granted with respect to defendant City of New York and the NYPD and with respect to plaintiffs' third, fourth, fifth, seventh, and tenth causes of action.  In the first cause of action, summary judgment is also granted with respect to all excessive force claims against Sergeant Rosenthal, Rizk's excessive force claim against Officer Lee, the fair trial claims against all defendants other than

38

Officer Mehirdel, and all conspiracy claims.  The second cause of action, the malicious

prosecution claim in the first cause of action, and all claims against Lieutenant Howley are

withdrawn.  Defendants' motion for summary judgment is denied in all other respects.  This

action is recommitted to the assigned Magistrate Judge for all remaining pre-trial matters,

including settlement discussions if appropriate.

SO ORDERED.

Dated: Brooklyn, New York
      May 22, 2020

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge